IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **STEVE YANCY,** | ] |
| Plaintiff, | ] |
| v. | ]   CV-01-BE-3245-S |
| **MEADOWCRAFT, INC.,** | ] |
| Defendant. | ] |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

This case is before the court on a motion for summary judgment (doc. # 24) filed by defendant Meadowcraft, Inc on plaintiff's claims for injunctive relief.[1] After briefing by both sides, the court held a hearing on May 30, 2007. For the reasons stated on the Record and summarized below, the court finds that the defendant's motion for summary judgment is due to be GRANTED in its entirety.

On December 17, 2001, plaintiff Steve Yancy, an African-American male, filed a complaint against his former employer, Meadowcraft, alleging retaliatory discharge in violation of 42 U.S.C. § 1981.[2] The court has jurisdiction of this case under 28 U.S.C. § 1331 pursuant to

---

[1] In September 2002, approximately two years after this lawsuit was filed, the court stayed the case based on Meadowcraft's filing of a suggestion of bankruptcy. This case was stayed until November 2005. After the court re-opened the case, the court ruled that bankruptcy discharge bars any claim for monetary relief, but that the plaintiff's claims for injunctive relief were not discharged in bankruptcy.

[2] At oral argument, plaintiff's counsel advised the court that he was withdrawing his retaliation claim based on his November 2000 termination. Consequently, this Memorandum Opinion does not address a retaliation claim based on Yancy's November 2000 termination.

1

its federal question jurisdiction.

Summary judgment is an integral part of the Federal Rules of Civil Procedure and allows a trial court to decide cases when no genuine issues of material fact are presented and when the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The parties' disagreement on each and every fact is not significant; the law requires only that "there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). *See also Celotex v. Catrett,* 477 U.S. 317, 327 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 251-52.

Mere speculation is insufficient to create an issue of fact and to defeat a properly-supported motion for summary judgment. *See Ramsey v. Leath*, 706 F.2d 1166, 1169-70 (11th Cir. 1983). Furthermore, the plaintiff's self-serving statements do not create a genuine issue of material fact. *See Smith v. Fed. Express Corp.,* 191 Fed. App'x 852, 855 (11th Cir.2006) (explaining that summary judgment is appropriate where no evidence supports plaintiff's allegations other than his own self-serving statements); *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir. 2005) ("For factual issues to be considered genuine, they must have a real basis in the record[;] ... [M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

## II. FACTS[3]

At various times during his employment, plaintiff served as a union representative for the

---

[3]Based on the lengthy and thorough presentation of the facts in the parties' briefs and at oral argument, the court does not include a complete recitation of the facts in this Memorandum Opinion. These facts, however, are presented in the light most favorable to plaintiff.

United Steel Workers of America.  During his employment, Yancy filed numerous grievances against the defendant alleging various forms of retaliation based on complaints of racially discriminatory employment practices and complaints of employment practices that penalized workers actively engaged in union activities.  Of particular importance in this case are Yancy's grievances filed in August, October, and November of 2000.

On August 29, 2000, plaintiff filed a grievance against Meadowcraft through his union protesting the distribution of overtime work assignments.  *See Ex.* E.  In his grievance, Yancy argued that overtime should be rotated by seniority, skill, and abilities.  The next day on August 30, 2000, Yancy filed another internal union grievance contending that he was assigned to work second shift (night shift) because of his complaints about overtime.  *See Ex.* E.

Plaintiff pursued the above-referenced grievances through the appropriate internal channels.  However, on October 3, 2000, Yancy filed a charge with the EEOC alleging that his schedule was abruptly changed because of his race.  *See Ex.* I.  In his EEOC charge, Yancy argued that white machine operators with less seniority were assigned to work the day shift. Plaintiff also filed another internal grievance in October 2000 protesting his shift change.  *See Ex.* E.

Plaintiff's employment problems at Meadowcraft continued, and on November 15, 2000, Yancy filed another an internal union grievance complaining about "harassment" from his supervisors.  Although this complaint does not specifically mention race, it refers to "non-discrimination" and requested that the defendant discipline Yancy's supervisors.

On November 17, 2000, plaintiff was disciplined for refusing to follow work orders. According to the corrective action form, Yancy refused a direct order to operate a machine used

3

to manufacture furniture legs. As a result of the above-referenced disciplinary incident, Yancy was suspended for three days for insubordination. On November 17, 2000, plaintiff filed a grievance with the EEOC alleging that his suspension was based on race. *See Ex.* I. When he returned from his three-day suspension, plaintiff was notified that he had been terminated, effective November 17, 2000. The record does not indicate that Yancy ever filed an EEOC charge relating to his subsequent termination. Ultimately, the EEOC closed the November 2000 charge on March 30, 2001.

Plaintiff filed an internal union grievance protesting his termination. Yancy's union grievance was processed through Meadowcraft's internal operating procedures. On June 15, 2001, an arbitrator held a grievance hearing relating to Yancy's November 2000 termination. Yancy testified at the arbitration, but neither side presented the transcript of that testimony to the court.

Several weeks later on June 26, 2001, the arbitrator ruled that Meadowcraft had wrongfully terminated Yancy. As a result of the arbitrator's decision, Yancy was ordered to be conditionally reinstated without back pay or benefits provided that the plaintiff's performance for a period of six months conformed to Meadowcraft's rules and regulations.

On July 1, 2001, Meadowcraft's union employees went on strike. Plaintiff was a union representative and participated in the strike. The parties agree that July 1, 2001 is the date that Yancy would have been returned to work pursuant to the arbitrator's decision but for the intervening strike. As a union representative, Yancy was present on the picket line from either 11 a.m. to 5 p.m. or 12 p.m. to 5 p.m. to ensure that picketers were present and that all the gates to the entrance to the facility were open.

4

On July 16, 2001, Yancy participated in the strike and picketed the employee entrance of the Pinson Facility, located on Highway 79. On the afternoon of July 16, 2001, Meadowcraft employee Kathy Grant and her son, Lucian Manning, exited the Pinson facility, crossing the picket line at the entrance to the facility. Manning was driving the vehicle and Grant was sitting on the passenger side. Mike Trammell, a manufacturing supervisor, was in the vehicle immediately in front of the vehicle driven by Grant's son. Grant and Trammell were parked near the entrance to the facility waiting to turn left onto Highway 79.

Approximately fifteen strikers, including the plaintiff, were present on the picket line and observed the vehicle driven by Grant's son cross the picket line. When the protestors observed Grant's vehicle, an unidentified union member hollered "there's Kathy, let's yell scab." Consequently, several of the union members came running down toward Grant's vehicle yelling "scab." Yancy was among those protestors and testified that, when he heard the yells, he ran down the hill toward the vehicle driven by Grant's son. As he ran down the hill, Yancy claims he had a fly swatter and a cell phone in his hand. However, Yancy testified that he was never close to the passenger side of Grant's truck and that, when he came down the bottom of the hill, Grant's truck had already crossed Highway 79 and was already in the median.

Seeing the group of protesters run toward the vehicle driven by Grant's son, Trammell pulled onto Highway 79 to avoid a confrontation between Grant and the protestors. Shortly after Mr. Trammell pulled out onto Highway 79, the vehicle driven by Grant's son also pulled out onto Highway 79 and onto the median. Several vehicles swerved to avoid colliding with Grant's vehicle.

Minutes after the incident occurred, Grant returned to the plant to report the incident to

Meadowcraft security and the police. Grant and her son both reported that they saw plaintiff charging toward them with what appeared to be a metal pipe in his hand. They reported that they drove across Highway 79 and into the median lane to avoid being struck by Yancy. The Sheriff, who investigated the incident, charged Yancy with reckless endangerment and threatening violence. However, Jefferson County Circuit Judge Robert Cahill ultimately found plaintiff not guilty of those charges.

Human Resources Manager Marty Brack received a call regarding the incident while he was in union negotiations and investigated the incident the next day. Brack met with Grant and Manning individually. Grant and her son both reported that they saw Yancy charging toward them with what appeared to be a metal pipe in his hand. According to Grant, her son had to drive across Highway 79 and into the median lane to avoid being struck by Yancy, causing oncoming vehicles to swerve and hit their brakes to avoid a collision.

At some point, Brack met with Trammell who corroborated Grant's version of events. Trammell told Brack that he pulled onto the median lane of Highway 79 so that Grant's son could safely exit the facility. Trammell also reported that, when he pulled onto the median lane of Highway 79, a car swerved to keep from hitting his vehicle. Furthermore, Trammell reported that another almost hit the vehicle driven by Grant's son.

Based on the above-referenced conversations, Brack determined that Yancy's behavior was a clear violation of Rule 21 of Meadowcraft Company Rules, Section I. Read in its totality, Section I, Rule 21 of the defendant's policies and procedures indicates that threatening violence against any person while on company premises is a serious offense and causes the greatest disruption and costs to the company and its employees. According to the policy, a violation of

Rule 21 "will subject an employee to disciplinary action up to and including dismissal." Nothing in the policy requires immediate termination.

Brack did not interview Yancy or any of the protestors who witnessed the event on July 16, 2001. Furthermore, Brack's investigation did not reveal that the plaintiff had ever come into actual physical contact with Grant's car.

On July 17, 2001, Mr. Brack terminated Plaintiff for threatening violence against a fellow employee. Ironically, despite the arbitrator's decision that Yancy be reinstated to his position as a machine operator, plaintiff never returned to work because of the strike and his July 17, 2001 termination. The Defendant terminated Yancy approximately two to three weeks after his reinstatement by the arbitrator.

### III. RETALIATION CLAIM

**A. The *Prima Facie* Case**

Yancy contends that his July 17, 2001 termination from his position as a machine operator at Meadowcraft's Pinson, Alabama facility was in retaliation for activities protected by 42 U.S.C. § 1981. To establish a *prima facie* case of retaliatory termination, a plaintiff must show that (1) he participated in an activity protected by 42 U.S.C. §1981; (2) he suffered an adverse employment action; and (3) a causal connection links the participation in the protected activity and the adverse employment decision. *Pipkens v. City of Temple Terrace, Fla.*, 267 F.3d 1197 (11th Cir. 2001). At issue in this case is the causal connection prong of the *prima facie* case. Yancy attempts to create a causal connection between his November 2000 EEOC charge and his July 17, 2001 termination based on temporal proximity.

To establish a *prima facie* case by relying on temporal proximity, plaintiff must show that

the protected activity and the adverse employment action were "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). In the Eleventh Circuit, "very close" means that the proximity between the protected activity and the employment action must be at least less than three months. *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th 2006) (affirming summary judgment for the employer, holding that the three-month gap between plaintiff filing his EEO complaint and the adverse employment action is not "sufficiently proximate to show causation"); *see also Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (affirming summary judgment for defendant, holding that the three-and-one-half month proximity between the protected activity and the adverse employment action was insufficient to create a jury issue on causation).

The record clearly indicates that the plaintiff filed an EEOC charge on November 2000 complaining that he was moved to the night shift in retaliation for complaining that other less senior white employees were not required to work the night shift. Consequently, the last protected activity based on *race* occurred in November 2000, approximately eight months prior to Yancy's July 17, 2001 termination-- the adverse employment action at issue in this case.

Even construing the facts in the plaintiff's favor, his most recent protected activity concluded three and one-half months before his termination (i.e., the March 30, 2001 date when the EEOC file was administratively closed); the temporal proximity between March 30, 2001 and the July 17, 2002 termination is four months, still outside the three months that the Eleventh Circuit has traditionally held to be the time frame to establish the requisite inference of a causal connection. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that time period between the protected activity and the allegedly adverse employment action is typically less than

three months to establish the requisite causal connection to establish a prima facie case of retaliation); *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001). In short, Meadowcraft argues that Yancy essentially abandoned his race-based claims relating to his November 2000 termination when he did not pursue the EEOC charge filed in November 2000.

At oral argument, Yancy urged the court to conclude that the last protected activity challenging racial discrimination was the plaintiff's testimony at his June 15, 2001 arbitration hearing challenging his November 2000 termination as one in retaliation for engaging in *union* activities. However, plaintiff's counsel conceded at oral argument that he could not direct the court's attention to anything in the record that would permit the court to conclude that the plaintiff's testimony at the June 15, 2001 arbitration hearing also included allegations of racial discrimination.

Without some evidence that the plaintiff's July 17, 2001 termination was based on a racially based animus-- instead of an animus based on activities in furtherance of the union-- or any other evidence contained in the record linking Yancy's July 17, 2001 termination to race, the court concludes that the plaintiff cannot establish a *prima facie* case of retaliation in violation of 42 U.S.C. § 1981.

### B. Pretext

Even assuming that Yancy could establish a *prima facie* case of retaliation, the court nevertheless concludes that a reasonable jury could not determine that the defendant's proffered reason for the plaintiff's July 17, 2001 termination was a pretext for racial discrimination.

A plaintiff can demonstrate pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons . .

9

. that a reasonable factfinder could find them unworthy of credence . . . . The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Hamilton v. Montgomery County Bd. of Educ.*, 122 F. Supp. 1273, 1281 (M.D. Ala. 2000) (citations omitted). Furthermore, the plaintiff can also establish pretext by producing evidence "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

In its motion for summary judgment, the defendant argues that it terminated Yancy because its investigation determined that he threatened Grant with a metal pipe because she crossed the picket line, not in retaliation for his prior complaints about racially motivated employment practices in November of 2000. Meadowcraft argues that, even if Yancy disagrees with the results of Brack's investigation, he cannot create a genuine issue of material fact on the genuineness of the defendant's belief that the workplace rule was violated. *See Knight v. Baptist Hosp. Of Miami*, 330 F.3d 1313, 1318 (11th Cir. 2003) (holding that the material issue is not whether the employer made the correct decision but whether the decision maker honestly believed the challenged action occurred).

Not surprisingly, plaintiff argues that the defendant's proffered explanation is a pretext for racial discrimination. In an attempt to reduce the "probative value" of Meadowcraft's argument that it has terminated employees who have not engaged in protected speech when learning about threats of violence, Yancy argues that a review of those situations clearly shows that those infractions were much more serious. According to the plaintiff, Yancy's conduct, even if he threatened Grant with a pipe, is not near the level of the others who Meadowcraft has

10

pointed out as comparators.  Yancy argues that those individuals threatened who were terminated had threatened actual violence and were in the same physical space as those who complained, thus making the threat of violence mor imminent than the alleged threat at issue in this case.

Lastly, Yancy argues that the nature of the investigation is further evidence of pretext. For example, plaintiff alleges that he was never interviewed as a result of Brack's investigation and that none of the ten to fifteen picketers who witnessed the event  was questioned.  Based on the defendant's failure to interview all persons with knowledge of this alleged infraction, Yancy argues that his July termination was not based on the defendant's good faith belief that he had violated Meadowcraft's rules against workplace violence but an expedient way for the defendant to undermine the arbitrator's reinstatement decision.

However, even viewing the record in the light most favorable to the plaintiff, the court concludes that a reasonable jury could not determine that Yancy's July 17, 2001 termination was a pretext for racial discrimination, as nothing in the record indicates that Meadowcraft's investigation was conducted in bad-faith or that Brack's decision to terminate plaintiff was designed to circumvent the arbitrator's decision overturning Yancey's November 2000 termination.  Perhaps more importantly, the record contains no evidence that Brack had any knowledge about Yancy's November 2000 EEOC charge.  Without any evidence of knowledge by the decisionmaker, the plaintiff cannot create a genuine issue of material fact on pretext.

Although Yancy understandably would have preferred a more comprehensive investigation of Grant's allegations, without any evidence of bad-faith or any legitimate reason that Meadowcraft would have had to disbelieve the statements of Grant and Trammell, the court concludes that a reasonable jury could not conclude that the defendant's proffered reason for the

plaintiff's July 17, 2001 termination was a pretext for racial discrimination.

Based on the foregoing, the defendant's motion for summary judgment is due to be GRANTED in its entirety.

DONE and ORDERED this 8th day of June, 2007.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE